SHAW v. The THOMAS COLLIER.

[See Case No. 12,718.]

---

## Case No. 12,726.

SHAW v. THOMPSON et al.

[Olc. 144.] [1]

District Court, S. D. New York. June, 1845.

CHARTER PARTY — CONSIGNEE — PRESUMPTION OF KNOWLEDGE — FREIGHT MONEY — NUDUM PACTUM—COSTS.

1. A consignee of a charterer, and dealing with him in that character. must be presumed to know the contents of the charter-party.
[Cited in Hatch v. Tucker, 12 R. I. 505.]

2. He cannot deal with the charterer as owner for the voyage, when by the charter-party the entire possession and control of the vessel remains with the master and owner.

3. If the consignee, in such case, credits the freight on the consignment to him, on debts owing him by the charterer. he will not thereby acquit himself of liability to the master therefor.

4. The payment to the charterer will be on the responsibility of the charterer. and not on that of the vessel or her owner.

5. The master. notwithstanding any interference or direction of the charterer. has a right to retain the goods until his lien shall be satisfied, and he may sue the consignees after delivery to them of the goods. and recover the

freight, at least to the amount due on the charter-party.

6. Where the consignee has notice that freight must be paid to the master and not to the charterer, it imposes the like obligation upon him as if so reserved in the bill of lading.

7. A consignee has no right to appropriate moneys due for freight to satisfy advances made by him to the charterer, although the bill of lading directs the freight to be paid to the consignee. But a direction to the consignee by the master, to pay a sum out of the freights to the charterer, will be equivalent to payment to the master.

8. An agreement by the master to pay a debt of the charterer to the consignee. without any consideration, is a nudum pactum, and void.

9. A receipt, alleged to be given through mistake, may be explained by parol evidence.

10. A libellant who demands an entire sum, when part of it has been paid according to his directions, and compels the respondent to defend, impairs his equity to costs in a court of admiralty.

11. A respondent who contests the entire demand of a libellant. when a portion of it is justly claimed, although he defeats the suit in the main matters in contestation, loses his equity to costs.

12. Admiralty courts, in adjudging costs in their discretion. regard the essential merits and equities of the parties rather than the result of the litigation.
[Cited in brief in Lubker v. The A. H. Quinby, Case No. 8,586.]

13. They may withhold costs from both parties when neither proposes to do what is substantially just between them without litigation.
[Cited in The Sarah Harris, Case No. 12,346.]

This action was instituted in personam against the respondents, to recover the sum of three hundred and fifty dollars, claimed to be due for freight on a cargo shipped at St. Jago de Cuba, and consigned and delivered to them. The respondents [Jonathan Thompson and others] deny all liability or indebtedness to the libellant [Charles H. Shaw] therefor, and aver that they have paid the whole amount of freight to the charterer of the vessel, with the assent of the libellant. The libellant being master and part owner of the schooner North Star, chartered her to Stearns, for a voyage to St. Jago de Cuba, from New-York and back, at $300 per month. the charterer to pay domestic and foreign port charges. The vessel performed the voyage out and returned to the port of New-York. March 7, 1845, with goods consigned to the respondents, for which $350 freight was payable. The bill of lading contained the singular statement that the $350 freight was "payable to Messrs. Thompson & Adams," who were the consignees. and are the respondents in this action. On the arrival of the vessel, notice was given to the respondents that freight must be paid the master or owner. and the goods were delivered them under that notice. The charterer (Stearns) was insolvent, and it was proved he was then indebted on the charter-party more than the amount of the freight payable on that shipment. There was due the respondents from the charterer, for advances made him upon the out-

---

[1] [Reported by Edward R. Olcott, Esq.]

ward voyage, $91 90, over the amount of freight received by them thereon; and they claimed that the return freight was to be applied in extinguishment of that balance, and refused to pay on the present bill of lading more than $258 10. which they proffered to the master, or the charterer, whichever of them should consent to receive it. After much altercation it was agreed that the $258.-10 should be paid to the charterer, and that the libellant would look to him for that amount of the freight. The defendants thereupon paid the charterer $258 10, in presence of the libellant, and with his direct assent, and took the charterer's receipt in full on the account current between the respondents and him. The same day the charterer paid the master $251 40, and took from him a receipt in full "for all demands to this date, (March 15,) on account of schooner North Star, chartered from the port of New-York to the port of St. Jago de Cuba, and back to New-York." The bills of lading being retained by the libellant, he subsequently demanded of the respondents $350, the whole return freight, and payment being refused, this action was brought for its recovery. The libellant insisted that the $251 40 paid him by the charterer was received in satisfaction of an outstanding demand against him on the charterparty, subsisting before the delivery of this freight to the respondents, and that the freight money now demanded was left for him to collect from the respondents; and that if his assent to the settlement between the respondents and the charterer is proved, and binds him, it can only affect him to the amount actually paid at that time, $258 10, and that he is entitled to recover the balance, $91 90, in the hands of the respondents. It was also urged that the testimony showed the master was illiterate, and incompetent to comprehend the transaction, and commit himself and his owner in the arrangement between the respondents and the charterer.

S. B. Noble, for libellant.
G. Spring, Jr., for respondents.

BETTS, District Judge. Although the transaction between the respondents and charterer was so conducted as to conclude the libellant, by his assent, that the $258 10 actually paid the charterer, should be accounted so much paid the master towards the freight, yet it is palpably unjust that the earnings of the vessel should be thus diverted to the satisfaction of debts due by the charterer to the respondents, for which the master or the vessel were in no way responsible. But the libellant cannot allege his own incapacity to do the business of the vessel, and he must be deemed, on the proofs, to have adopted the payment actually made in his presence, and with his consent, to Stearns, as made to himself.

The respondents must be presumed to know the terms of the charter-party, and that they could not deal with the charterer as owner of the vessel for the voyage, her entire possession and control being reserved to the master and owners, (3 Kent, Comm. 219, 220,) and, therefore, their advances to the charterer on the outward voyage must be regarded made on his personal responsibility, and not on any right to sequester or reserve the freights which might come into their hands on her return, for advances on the credit of the freight. Whatever stipulations may have been made between the respondents and the charterer for the appropriation of the return freights, the right of the master to collect them from the consignees after delivery to them of the goods, at least to the amount due on the charterparty, cannot be questioned, (Palmer v. Gracie [Case No. 10,692]; Ruggles v. Bucknor [Id. 12,115]; The Volunteer [Id. 16,-991]; Certain Logs of Mahogany [Id. 2,559]; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 39; Gracie v. Palmer, 8 Wheat. [21 U. S.] 605; 3 Kent, Comm., 3d. Ed., 138, 219, 220,) and the English rule unquestionably coincides with the American to that extent, (Abb. Shipp. 286, 287, 288; Smith, Merc. Law, 187). This right he might waive, as he could his lien on the goods, by express agreement with the charterer or consignees, on adequate consideration, otherwise no arrangements between consignees and a charterer, not authorized by the charter-party, will be of avail against the right of the ship to freight. The delivery of the goods to the consignees, and their acceptance of them under the bill of lading, raised an assumpsit against them to pay freight according to the stipulation of the bill of lading. Abb. Shipp. 177, 178; 3 Kent, Comm. 138. And this implied obligation becomes equivalent to a positive one, when the goods are received, as in this instance, with notice that the freight must be paid the master, and not to the charterer. The goods for which freight is now claimed were laden on board at St. Jago de Cuba, under the charter-party, and it must accordingly be assumed that the special provisions in the bill of lading were inserted by the charterer or his agent, for his benefit. The goods were to be delivered to the respondents or their assigns, he or they paying freight therefor, $350 for the whole, payable to said Messrs. Thompson & Adams, (the respondents.) The testimony shows that there was a balance of account due the respondents from the charterer for advances, proceeds of cargo, &c., on the outward voyage; and it was probably with intent to secure that balance that the charterer required the freight, whoever should be chargeable for it, should be placed in the hands of the respondents. This he had incontestably a right to do, provided he fulfilled his engagement in the charter-party; but the law would not permit him to regulate the collection of freights on the return of the vessel, so as to bar the master the

recovery of it from the consignees, if not paid by the charterer. The respondents understood their liabilities, for the evidence is full that they avowed their readiness to pay the freight to the master or charterer, as it might be agreed between the two, and set up no claim to retain the freight in their own right. They pressed the satisfaction of the balance standing on their account current against the charterer, and declined paying over the freight till that was secured, but such appropriation was not claimed on the footing that the freight was subject to their disposition, but that it was money of the charterer in their hands, out of which they were entitled to retain the balance due them. It is clear they had no legal right to apply the money in that manner, there being no surplus belonging to the charterer. The whole sum was insufficient to meet the demands of the owners under the terms of the charter-party, to whom it primarily belonged. Abb. Shipp. 247. So far as the libellant consented to the payment of the freight to the charterer, such payment would be equivalent to one made to himself, and will acquit the respondents from any after accountability to him for it. The respondents insist the libellant agreed they should account with the charterer for the whole freight, knowing it was to go in extinguishment of his debt to them, and explicitly sanctioned such appropriation when made, and expressed himself satisfied to look to the charterer for his pay.

The testimony of Thompson, brother of one of the respondents, who was present at the time the money was paid by them to the charterer, is relied upon as definite and conclusive upon this point. He says his attention was called to the conversation between the parties. He heard his brother say he would pay the money to either, if the other consented to it, and told them they must settle between themselves whom he should pay. The libellant said, "You can pay Mr. Stearns," (the charterer.) The respondent asked, "Will you both, then, be satisfied if I pay Mr. Stearns this money?" The libellant replied in the affirmative. The respondent then asked, "Will you have any claims against me?" The libellant answered, "No." The respondent further said, "You will look to Stearns for your pay;" to which the libellant assented. The following receipt was then drawn by the respondent, subscribed by Stearns, and was in the hands of the libellant: "Recd., New-York, 15th March, 1845, from Messrs. Thompson & Adams, two hundred and fifty-eight $10/100$ dollars in full, for balance due me as per acct. current of 12th instant, which is hereby acknowledged as correct." A receipt was drawn at the same time for the libellant to sign, but he declined executing it, because he said that would be giving two receipts for one payment. The witness did not notice whether the payment was in money or by a check,

but thinks he observed the check-book of the respondents on the table. His brother requested him to witness the declaration of the libellant. Todd, a clerk of Stearns, proved the account current, and that the libellant had seen it. It charged Stearns $286 78, and credited him $544 88, including in the credit the $350 freight. He testified that repeated conversations were held between the libellant, Stearns and Parrington, (who obtained the charter,) about the settlement. The libellant claimed $680 as due him on the charter-party, and he knew the respondents would not pay the freight until he and Stearns had settled together. It was agreed that Stearns should receive the money from the respondents, and after the $251 $41/100$ was paid by Stearns to the libellant, the charter-party was cancelled by his receipt in full. The witness testified that he understood the arrangement between the libellant and Stearns to be, that Stearns should take the money, and that the libellant should assent to it in presence of the respondents, and afterwards should sue the respondents and recover the whole $350 from them. The witness qualified this statement afterwards by saying, he was not sure but that arrangement was made between Stearns and Parrington alone; but he accepted it as understood by all those present that such course was to be pursued. Parrington testified that he acted only as a friend in endeavoring to bring about a settlement, and securing the master's rights; that the master was not a man of ordinary capacity for business. The witness was not present when the respondents paid the money, but was when Stearns paid libellant in part. The libellant insisted he was to have the $350, and said he could not understand how it was he was not to get his whole freight, as that was all he was to receive for the entire voyage.

I am satisfied, from the evidence, that the master was not knowingly concerned in any wrongful arrangement with Stearns to circumvent the respondents and compel them to pay the freight-money twice, and that the true nature of the understanding was, that Stearns should receive from them all the money they would consent to pay on the account, and that the libellant would accept such payment as one made to himself. It is undoubtedly true, that the respondents acted upon the understanding that they were only to pay the libellant the balance in their hands beyond the account with Stearns, and that the libellant consented that the indebtedness of Stearns to them should be satisfied out of the money due for freight. The course of the negotiation, and the uniform claim of the respondents in this respect, was calculated to give that impression; but it is to be remarked, that the testimony does not show the libellant ever explicitly and in terms admitted there should be an appropriation of more of the freight

moneys to that debt than the amount which he understood had been paid to Stearns. For the want of full proof of his directions or assent to such appropriation, the respondents cannot be protected in reserving the freight for payment of the debt of Stearns, owing to them. The libellant had no connection with that indebtedness, and was no way liable for it, so as to subject his property to its satisfaction, beyond what he had directly authorized to be paid to Stearns. The further objection would also exist to the respondents' claim, if they proved the most positive consent of the libellant that such appropriation of his money might be made, that it was a parol agreement to satisfy the debt of a third person, and not obligatory in law on him. 3 Kent, Comm. 121, 122. The respondents part with nothing, and are no way made worse by such promise. The whole agreement imputed to the libellant unexecuted, would be without consideration and void. Simpson v. Patten, 4 Johns. 422; Jackson v. Rayner, 12 Johns. 291; 14 Wend. 246; 15 Wend. 343. In either case, because of defective proof, or because such agreement, if proved, would be nudum pactum, the libellant would be entitled to disavow it and demand the money actually due him, irrespective of Stearns' obligations to the respondents. The only point of view in which the case could be placed to justify the appropriation of the money on Stearns' account, would be that Stearns being charterer of the whole vessel for the voyage, on a contract to pay a fixed sum per month for her services, would be primarily entitled to her earnings, and the respondents might, therefore, rightfully contract with him to apply such earnings in satisfaction of his debt to them, and the assent of the master to such appropriation would be no more than a waiver of his right to claim freight of the defendants, and that it is competent to make such waiver by parol.

These propositions may be admitted as sound law without varying the case, because the respondents had express notice that the master would claim the freight, and were directed not to settle it with Stearns, and they do not prove a waiver, or withdrawal of that notice, further than regards the money actually paid him in presence of the master. It is manifest, from the testimony of Doctor Thompson, that the dullness and incapacity of the libellant in matters of business must have been well understood by the respondents. It was, therefore, incumbent on them, in order to raise an equity in their favor against his demand, because of his acquiescence or assent to their paying the freight to the credit of Stearns, in their account with him, to prove that he understood clearly the consequences they claimed from that assent, and that it was intended to divert his right to resort to them for the balance of $350, still retained by them. The receipt subsequently given by him to Stearns, and his discharge of the charter-party, is proved to have been without payment to him of the balance claimed against the respondents. The libellant is permitted by law to show, by parol evidence, that the receipt was given without consideration, and is not binding upon him, if that receipt and discharge of the charter-party between Stearns and the master can be made to support the defence of the respondents. 1 Greenl. Ev. p. 373, § 305; Southwick v. Hayden, 7 Cow. 334. It is plain, from the testimony of Parrington, that the master supposed the arrangement was to secure him the $350 freight in cash; and the evidence of Doctor Thompson goes no further than to prove his positive consent that the respondents might pay to Stearns $258 10 out of the sum. It seems to me, therefore, upon the whole case, that the libellant has established a right to recover from the defendants the balance of freight unpaid by them, to wit, $91 90. If the libellant's action and demand had been framed for the recovery of that sum alone, I should hold he was entitled to recover, in addition, the costs incurred in prosecuting and establishing his demand. The libel, however, proceeds for the whole freight, $350, and asserts that no part of it has been paid, and in the prayer for relief, asks that the court pronounce in his favor for that sum. No distinction is made between the part paid by his direction to the charterer, and the part retained by the respondents, and sought to be applied to their account against Stearns, and the case throughout the trial was treated as a demand for the whole freight money. The respondents, accordingly, were compelled to protect themselves against the action, and have defeated it in the material part. The demand to this extent was inequitable, and the defendants ought not to be punished with costs for resisting it. I think the respondents, also, ought not in equity to be allowed costs against the libellant. The appropriation made by them of the $91 90 of his money cannot be sanctioned under the circumstances in proof. They are exempted from the whole costs of suit only because the libellant did not specifically demand that balance, and thus permit them to avoid contesting the action by tendering it to him or paying it in court. But they do not entitle themselves upon the facts to costs against the libellant, because they put him to the necessity of maintaining his right to the unpaid $91 90.

A court of admiralty, in exercising its discretion in the disposition of the costs of suit, will look to the substantial rights and equities between the parties, rather than to the mere result of the litigation. The Martha [Case No. 9,144]; [Bingham v. Cabbot] 3 Dall. [3 U. S.] 34; 1 Hagg. Adm. 81; Dunl. Prac. 102. And costs may properly be withheld from both parties, when neither of them offers to the other what is substantially right in the case.

Wherefore, it is ordered, adjudged and decreed, that the libellant recover in this case

against the defendant the sum of ninety-one dollars and ninety cents.

It is further ordered, that neither party recover costs as against the other.